```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE WESTERN DISTRICT OF OKLAHOMA

 3
     UNITED STATES OF AMERICA,        )
 4                                    )
                                      )
 5            Plaintiff,              )
                                      )
 6   vs.                              ) CASE NO. CR-23-237-SLP
                                      )
 7                                    )
     JEFF WENG and TONG LIN,          )
 8                                    )
                                      )
 9                                    )
              Defendants.             )
10                                    )

11

12                JURY TRIAL - VOLUME I OF II

13                TRANSCRIPT OF PROCEEDINGS

14           BEFORE THE HONORABLE SCOTT L. PALK

15              UNITED STATES DISTRICT JUDGE

16                  JANUARY 17, 2024

17

18

19

20

21

22

23

24

25   Proceedings recorded by mechanical stenography; transcript
     produced by computer-aided transcription.
```

Emily Cripe, CSR
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5094

GOVERNMENT
EXHIBIT
27

```
 1                          APPEARANCES

 2   FOR THE GOVERNMENT:

 3        Mr. Wilson D. McGarry
          Mr. David R. Nichols
 4        Assistant United States Attorney
          U.S. Attorney's Office
 5        210 West Park Avenue, Suite 400
          Oklahoma City, Oklahoma 73102
 6
 7   FOR THE DEFENDANT JEFF WENG:

 8        Mr. Todd Henry
          Todd Henry & Associates
 9        1500 Walnut Street, Suite 1060
          Philadelphia, Pennsylvania 19102
10
11
     FOR THE DEFENDANT TONG LIN:
12
          Mr. Jeremy Bennett
13        Mr. J. Ken Gallon
          Bennett & Gallon
14        105 1st Avenue NE
          Miami, Oklahoma 74354
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                            INDEX

 2                                                         PAGE
        Court's preliminary instructions..................... 12
 3
        OPENING STATEMENTS:
 4
        Plaintiff (by Mr. Nichols)........................... 21
 5      Defendant Weng (by Mr. Henry)....................... 27
        Defendant Lin (by Mr. Gallon)....................... 29
 6
        EVIDENCE ON BEHALF OF THE GOVERNMENT:
 7
        CODY GIBSON
 8           Direct Examination By Mr. Nichols............... 29
             Cross-Examination By Mr. Henry................. 48
 9           Cross-Examination By Mr. Gallon................ 51

10      BRIAN DELIBERATO
             Direct Examination By Mr. McGarry.............. 56
11           Cross-Examination By Mr. Henry................. 85
             Cross-Examination By Mr. Bennett............... 97
12           Redirect Examination By Mr. McGarry........... 107

13      SERGIO ESPINOZA
             Direct Examination By Mr. Nichols............. 110
14           Cross-Examination By Mr. Bennett.............. 118

15
        HEATHER LOFFER
16           Direct Examination By Mr. Nichols............. 120

17      ZHIANG ZHANG
             Direct Examination By Mr. McGarry............. 126
18           Cross-Examination By Mr. Gallon............... 131

19      DANIELLE SHUTTS
             Direct Examination By Mr. McGarry............. 132
20           Cross-Examination By Mr. Henry................ 142
             Cross-Examination By Mr. Bennett.............. 147
21

22

23      Reporter's certificate.............................. 156

24

25
```

Emily Cripe, CSR
United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5094

BRIAN DELIBERATO - Direct by Mr. McGarry

1   Brian Deliberato.

2        (WITNESS SWORN.)

3            THE COURT:  Special Agent Deliberato, if you can

4   adjust yourself up there.  You can adjust that microphone, if

5   you need to.

6        And, counsel, you may proceed.

7                            BRIAN DELIBERATO

8                        DIRECT EXAMINATION

9   BY MR. MCGARRY:

10  *Q.*   Please state your name.

11  *A.*   Brian Deliberato.

12  *Q.*   And how are you employed?

13  *A.*   I'm a special agent with the FBI.

14  *Q.*   And how long have you been employed with the FBI?

15  *A.*   A little bit over one year.

16  *Q.*   And what are your duties and responsibilities as FBI

17  agent?

18  *A.*   Currently, I'm assigned to matters of national security

19  primarily focused on investigations involving threats and

20  attacks by international terrorist.

21  *Q.*   You might need to pull that microphone a little bit

22  closer.

23  *A.*   Better?

24            THE COURT:  You might adjust it upwards a little

25  bit too, agent.  Thank you.

BRIAN DELIBERATO - Direct by Mr. McGarry

1  Q.   (BY MR. MCGARRY)  Thank you, Agent Deliberato.

2       To become a special agent with the FBI, did you receive

3  any training?

4  A.   Yes.

5  Q.   And could you describe that for us?

6  A.   We go through an academy at Quantico.  This academy

7  involves criminal law, it involves lessons on defensive

8  tactics, firearms, use of force, investigations, developing

9  investigations, and other legal processes to -- to gather

10 information and techniques.

11 Q.   Have you had training on executing search warrants?

12 A.   Yes, I have.

13 Q.   And have you received training on conducting searches?

14 A.   Yes.

15 Q.   Have you also received training on drug identification?

16 A.   Yes.

17 Q.   Is marijuana included in that?

18 A.   Marijuana is included.

19 Q.   What kind of training or experience have you had on

20 identifying raw or processed marijuana?

21 A.   So in my -- in my training at Quantico, I received

22 trainings that involved identifying marijuana in different

23 forms, including raw, including what plants look like and how

24 it's grown.

25      I have also been a part of on-the-job experiences to

BRIAN DELIBERATO - Direct by Mr. McGarry

1  include other search warrants at marijuana grows that included

2  marijuana in all different forms, plants, containers,

3  packagings.

4  Q.   So do you have experience identifying marijuana plants?

5  A.   Yes.

6  Q.   And as a special agent for the FBI, do you assist with

7  other investigations when asked?

8  A.   Yes, I do.

9  Q.   And do those investigations involve firearms and drugs?

10  A.   Yes.

11  Q.   And have you assisted in cases involving marijuana?

12  A.   Yes, I have.

13  Q.   Specifically cases involving marijuana grows?

14  A.   Yes.

15  Q.   During those investigations, have you identified marijuana

16  and marijuana plants?

17  A.   I have.

18  Q.   Now, you told us you have been with the FBI for

19  approximately one year; is that correct?

20  A.   That's correct.

21  Q.   And what did you do before you became a special agent with

22  the FBI?

23  A.   I was an officer in the United States Army, primarily a

24  chemical officer with -- dealing with issues involving

25  chemical, biological, radiological and nuclear substances.

BRIAN DELIBERATO - Direct by Mr. McGarry

1   Q.   How long did you do that?

2   A.   Five and a half years.

3   Q.   Agent Deliberato, are you one of the agents who

4   participated in the execution of a federal search warrant on

5   May 17th of 2023 at a marijuana grow facility in Wetumka,

6   Oklahoma?

7   A.   Yes, I was.

8   Q.   Is that grow located at 7828 State Highway 9 in Wetumka,

9   Oklahoma?

10  A.   Yes.

11  Q.   And during the search, were photos taken to document that

12  search?

13  A.   Yes.

14  Q.   Along with videos?

15  A.   Yes.

16  Q.   Okay.

17         MR. MCGARRY:  Let's take a look at Government's

18  Exhibit 300, please.

19     (Exhibit published to the jury.)

20  Q.   (BY MR. MCGARRY)  What do we see here?

21  A.   That is the entrance to the grow operation in Wetumka.

22  You're looking at the front gate entering the compound, the --

23  the marijuana field.

24  Q.   And is this the location of where you executed the search

25  warrant on May 17th of 2023?

BRIAN DELIBERATO - Direct by Mr. McGarry

1  A.    Yes.  This is the front gate of that.

2  Q.    And so what did this place appear to be to you?

3  A.    It appeared to be a marijuana grow compound with an

4  exterior fence and multiple grow houses throughout, and a

5  residence and a side living.

6  Q.    Based on your search, did it appear to be one single

7  business or multiple businesses?

8  A.    It appeared to be one single business.  There was one

9  fence surrounding the entirety of it.  It did not look like any

10  deviations.  It looked like one -- one compound.

11  Q.    You said you participated in the search.  What was your

12  role during the search?

13  A.    I was initially assigned as a marijuana sampler, and then

14  I was a searcher.

15  Q.    When you say marijuana sampler, what does that mean?

16  A.    So we would go around, our designated task was to go into

17  each and every individually housed room where marijuana plants

18  were.  And we would take two samples.  That's -- we take

19  scissors, gloves.  We put them in individual bags, one bag from

20  one plant, and then another bag from a another plant from

21  different sections of that same room.  And we would do that to

22  every single room throughout the grow.

23  Q.    So you went into the various grow rooms?

24  A.    Yes.

25  Q.    And do you recall about how many that you went into?

BRIAN DELIBERATO - Direct by Mr. McGarry

1   *A.*   I went into all of them.  However, I believe I took

2   samples at approximately 23 of them.

3   *Q.*   And do you remember total number of rooms?

4   *A.*   To the best of my knowledge, there was 25 grow rooms.

5            MR. MCGARRY:  And let's take a look at Government's

6   Exhibit 100.

7        (Exhibit published to the jury.)

8   *Q.*   (BY MR. MCGARRY)  What are we looking at here?

9   *A.*   You are looking at an overhead map view of the -- the

10  marijuana grow operation in Wetumka.

11  *Q.*   Is this how it appeared on May 17, 2023?

12  *A.*   Yes, it is.

13  *Q.*   And did you walk through all the structures that are shown

14  here?

15  *A.*   Yes, I did.

16  *Q.*   Now, they're numbered.  And you mentioned that you went

17  through maybe 25 grow rooms; right?

18  *A.*   That is correct.

19  *Q.*   So tell us -- tell us about that.  Are these houses

20  divided up?  How did that work?

21  *A.*   Of course.  So in each of these larger buildings, you

22  would have smaller rooms.  They would have marijuana plants at

23  different stages of grow.

24  *Q.*   So let's look at the bottom here.

25            MR. MCGARRY:  If we could zoom in, please.

BRIAN DELIBERATO - Direct by Mr. McGarry

1   Q.   (BY MR. MCGARRY)  So where did -- does this show the entry
2   of that marijuana grow?
3   A.   Yes, at the -- the bottom left was that -- that fence area
4   where we saw previously.
5   Q.   And you went through all those buildings right there?
6   A.   Yes.
7   Q.   And what were in those buildings?
8   A.   In each of those buildings were different rooms housing
9   marijuana plants, excessive amounts of marijuana plants at
10  different stages in the grow process.
11             MR. MCGARRY:  If we could back out and go to the
12  top half of the map.
13  Q.   (BY MR. MCGARRY)  What do we see here?
14  A.   In the zoomed-in view, you're looking at the top of the
15  marijuana grow.  In this area was primarily the residence.
16       There was a house, as is noted by that arrow.  That's the
17  residence, the main residence.  It looked like a normal house
18  that anybody would live in.
19       Off to the right side of that residence, labeled living
20  one through fours, that was a barracks situation where there
21  was a -- a long -- a long building with individual rooms that
22  would house what appeared to be workers on the grow operation.
23  Q.   And during the search, did you search the residence and go
24  through these barracks area as well?
25  A.   Yes, I did.

```
 1  Q.   And who did you observe living in the barracks?
 2  A.   In the barracks, I -- I observed the workers that were
 3  living there.  That was their living conditions.
 4       Each of the workers would have their room or shared room.
 5  They would have their -- their bed and all of their belongings
 6  within this smaller-sized bedroom, and then they had a shared
 7  kitchen area and a shared bathroom area within this barracks.
 8  Q.   And you also went through the main residence; right?
 9  A.   Yes, I did.
10  Q.   Who appeared to live in the main residence?
11  A.   It appeared the owner of the establishment lived in the
12  main residence, along with -- in the -- in the main -- in the
13  master bedroom, the boss and what appeared to be another female
14  lived in the master, and there was another living bedroom in
15  that residence off to the other side.
16            MR. HENRY:  Judge, I have an objection.
17            THE COURT:  Grounds?
18            MR. HENRY:  Mischaracterization of "boss" and
19  "owners" without any foundation to who the boss is.
20            THE COURT:  Sustained.
21  Q.   (BY MR. MCGARRY)  Agent Deliberato, did you observe any
22  differences in the living conditions between people living in
23  the barracks and people living in the main residence?
24  A.   Yes, I did.
25  Q.   What were those differences that you observed?
```

BRIAN DELIBERATO - Direct by Mr. McGarry

1   *A.*    So in the barracks it was a very simple lifestyle, and I
2   would categorize that by a bed and a closet and perhaps boxes
3   to store dried food and all of their belongings within a --
4   within a small, small area.  Some of them had -- they had
5   created their own perhaps shower or foot washing station using
6   a -- using a small bucket.  That was the -- in the barracks
7   area.

8       Whereas, in the main residence it appeared to be a -- a
9   normal house.  It had a kitchen, a lot of space, a lot of
10  storage.  In the -- in the master bedroom, very nice clothes,
11  what appeared to be designer watches and nice clothes, nice
12  storage, everything was laid out like a house would be.
13  *Q.*    Could you describe the process of the search?  How was it
14  conducted?
15  *A.*    Starting with the --
16  *Q.*    From the beginning.
17  *A.*    Okay.  So initially when we entered, we made sure that the
18  area was secure, that there was nothing dangerous there.  And
19  then we started conducting a search of the marijuana grow
20  rooms.

21      I was assigned to be a sampler.  Me and my partner went
22  around and sampled two marijuana plants from each -- each room,
23  put them into bags, sealed them, labeled them, and then handed
24  them over to the -- the custodian that was holding all of the
25  marijuana.

BRIAN DELIBERATO - Direct by Mr. McGarry

1    We then moved to the main residence.  After all the photos

2  were taken of the main residence, we then were assigned rooms

3  and we went to those rooms and we conducted a search.  We'd go

4  from left to right or right to left, whatever made sense in

5  that room, and looking for things that were denoted in the

6  search warrant that were to be seized or taken as evidence.

7         MR. MCGARRY:  Let's look at Government's

8  Exhibit 303.

9    (Exhibit published to the jury.)

10 *Q.*  (BY MR. MCGARRY)  What do we see here?

11 *A.*  You're looking at the front of that residence, at the back

12 of the -- the marijuana grow.

13        MR. MCGARRY:  304, please.

14   (Exhibit published to the jury.)

15 *Q.*  (BY MR. MCGARRY)  What do we see here, Agent Deliberato?

16 *A.*  You're looking at the back of that residence that we were

17 just looking at previously.

18 *Q.*  Now, you searched the residence; right?

19 *A.*  Yes.

20 *Q.*  Could you just describe the layout of the residence?

21 *A.*  The layout of this residence, it appeared to be a -- a

22 normal residence.  There was bedrooms, bathrooms, a kitchen, an

23 office, furniture.

24 *Q.*  Do you recall how many rooms?

25 *A.*  To the best of my knowledge, there was two -- three rooms.

BRIAN DELIBERATO - Direct by Mr. McGarry

1   Q.   And how many people were found living in that house?

2   A.   Based on what it appeared to be, there was three different

3   people living in that residence.

4   Q.   Did you identify a master bedroom?

5   A.   Yes, we did.

6   Q.   How did you determine that there was, indeed, a master

7   bedroom?

8   A.   So when you entered the residence, it was the largest

9   bedroom.  It had a connected bathroom.  It had a connected

10  walk-in closet.  It was -- had an exterior door that led to all

11  of those things that I just described.

12  Q.   Did you conduct a search of that room?

13  A.   Yes, I did.

14          MR. MCGARRY:  Let's look at Government's

15  Exhibit 305, please.

16      (Exhibit published to the jury.)

17  Q.   (BY MR. MCGARRY)  What do we see here?

18  A.   You're looking at the small hallway leading into what we

19  designated -- what we -- what appeared to be the master

20  bedroom.

21  Q.   And did this door lead to the master bedroom?

22  A.   Yes.  This door led straight to the master bedroom and

23  then off to the left.  And right to the left was that bathroom,

24  and to the right was the walk-in closet.

25  Q.   And did you search both the walk-in closet and the

BRIAN DELIBERATO - Direct by Mr. McGarry

1  bathroom?

2  A.   Yes.

3  Q.   And did you go further into the master bedroom; right?

4  A.   Yes.

5         MR. MCGARRY:  Let's look at Government's

6  Exhibit 306.

7     (Exhibit published to the jury.)

8  Q.   (BY MR. MCGARRY)  What do we see here?

9  A.   This is a photo walking further into that master bedroom.

10  Q.   And please show Government's Exhibit 307.

11  A.   This is the master bedroom on the left side where the bed

12  was.

13  Q.   And this is the same room of the photo that we just saw in

14  306?

15  A.   Yes.

16  Q.   And what did you find in this room?

17  A.   In this room there was various personal documents,

18  identification, including IDs, credit cards, other documents.

19  Also included in this room was clothing, nice -- nice watches

20  and wallets.

21         MR. MCGARRY:  Let's look at Government's

22  Exhibit 308, please.

23     (Exhibit published to the jury.)

24  Q.   (BY MR. MCGARRY)  What do we see here?

25  A.   You're looking at a wallet that was found in the master

BRIAN DELIBERATO - Direct by Mr. McGarry

1    bedroom.

2              MR. MCGARRY:  Can we zoom in there?

3    Q.   (BY MR. MCGARRY)  Whose name appears on that driver's --

4    that item there?

5    A.   The name on the driver's license is for Jeff Weng.

6    Q.   And that was found in the master bedroom?

7    A.   Yes.

8    Q.   Let's look at Government's Exhibit 309.  What do we see

9    here?

10   A.   That is a wallet containing an American Bank & Trust card

11   found in the master bedroom.

12   Q.   And whose name is on that card?

13   A.   Jeff Weng.

14   Q.   Did you say that's a bank card?

15   A.   Yes.

16             MR. MCGARRY:  Let's look at Government's

17   Exhibit 310.

18        (Exhibit published to the jury.)

19   Q.   (BY MR. MCGARRY)  What do we see here?

20   A.   This is a photo of the closet.  Once you enter the

21   hallway, into the master bedroom, it was just off to the right.

22   Q.   Is this the walk-in closet you spoke about earlier?

23   A.   Yes, it is.

24   Q.   Did you search this room?

25   A.   Yes, I did.

BRIAN DELIBERATO - Direct by Mr. McGarry

1   *Q.*   And what was significant about this closet?

2   *A.*   So in this closet there was a lot of documentation.  There

3   was boxes containing documents and information.  There was

4   clothing for what appeared to be a male and a female.  And then

5   a search was also conducted of the attic space.

6          MR. MCGARRY:  And if we could zoom in at the top.

7   *Q.*   (BY MR. MCGARRY)  Does that lead to the attic space, what

8   we see there?

9   *A.*   Yes.

10  *Q.*   Did you conduct a search of that attic space?

11  *A.*   Yes, I did.

12  *Q.*   And what did you find when you opened that attic space

13  door panel?

14  *A.*   When I opened the attic space door panel, I immediately

15  came across a very -- what appeared to be a very large bundle

16  of cash.

17         MR. MCGARRY:  Can we look at Government's Exhibits

18  311?

19         (Exhibit published to the jury.)

20  *Q.*   (BY MR. MCGARRY)  What do we see here?

21  *A.*   You're looking into that attic space inside the walk-in

22  closet, inside the master bedroom.  Looking up into that attic

23  space, you can see that there's two very large bundles of cash

24  that were shrink wrapped.

25  *Q.*   Is this how it looked when you opened that attic space?

BRIAN DELIBERATO - Direct by Mr. McGarry

1  A.    Yes, it is.

2  Q.    Did you take that money down?

3  A.    Eventually we did, yes.

4  Q.    And was there anything significant about finding this

5  money in the attic like that?

6  A.    Yes.  It showed that the -- the money was put there out of

7  sight so that it couldn't be seen.  It was there for storage.

8  It was there so that anybody walking throughout the house

9  couldn't find it.

10  Q.    Based on your training and experience, what's significant

11  about that?

12  A.    Money that is wrapped like that and held like that, it's a

13  sign of illicit activity --

14            MR. HENRY:  Objection.

15            THE COURT:  Overruled, if he can testify based on

16  his training and experience.  Overruled.

17  Q.    (BY MR. MCGARRY)  Continue, Agent Deliberato.

18  A.    Yeah.  It shows that they're not wanting to use a bank,

19  that it's -- that it's put there for storage.

20            MR. MCGARRY:  If we could look at Government's

21  Exhibit 312, please.

22        (Exhibit published to the jury.)

23  Q.    (BY MR. MCGARRY)  What do we see here?

24  A.    You're looking at another view of those bundles of cash.

25  Q.    And is this -- once you took it down, is that the same

BRIAN DELIBERATO - Direct by Mr. McGarry

1    money that you found in the attic?

2    *A.*   Yes, it is.

3    *Q.*   And was that money later submitted to be counted?

4    *A.*   Yes, it was.

5              MR. MCGARRY:  If we could take a look at

6    Government's Exhibit 338.

7         (Exhibit published to the jury.)

8    *Q.*   (BY MR. MCGARRY)  And you have a notebook in front of you

9    too, just if that helps you, Agent Deliberato.

10        Does Exhibit 338 consist of two pages?

11   *A.*   Yes, it does.

12   *Q.*   What do we see on this first page here?

13   *A.*   On this first page is a -- is an FBI sheet used to count

14   money.

15   *Q.*   And is this a record that accounts for the money that you

16   found?

17   *A.*   Yes.  One of them is for one of the bundles and the other

18   one is for the other bundle.

19   *Q.*   And how much -- what was the amount in the first bundle

20   that we see on this first page?

21   *A.*   The first bundle totalled out to $50,040.

22   *Q.*   And to the left of that, what denomination were those

23   bundles in?

24   *A.*   According to the sheet, there was 2,502 $20 bills.

25   *Q.*   Okay.  Let's look at the next page, please.

BRIAN DELIBERATO - Direct by Mr. McGarry

1       What do we see here?

2   A.   On this sheet you're looking at another FBI form that's

3   used to count money for the other bundle.

4   Q.   The other bundle of money that you found?

5   A.   Yes.

6   Q.   And what was the total amount of money in that other

7   bundle?

8   A.   $49,970.

9   Q.   And off to the left, what were the denominations of that

10  bundle?

11  A.   In this bundle there was 2,498 $20 bills and two $5 bills.

12  Q.   And, Agent Deliberato, based on your training and

13  experience, is there anything significant about the

14  denominations that were found in these bundles?

15  A.   Yes, there is.

16  Q.   Could you please tell us?

17  A.   So normally when drugs are involved, drug users who buy --

18  buy drugs normally will buy drugs with smaller denominations,

19  twenties or fives, and then this money is continuously sent to

20  drug dealers, drug smugglers, and all the way up.

21       They don't use banks, so they wouldn't put it in and get

22  $100 bills out.  They wouldn't exchange the money, the money

23  would simply just go up the chain.  So seeing this number of

24  twenties and fives could signify that.

25  Q.   What does it signify?

1    *A.*    It could signify drug dealing.

2    *Q.*    And, Agent Deliberato, what was the total amount of the

3    bundles that you found in the attic space?

4    *A.*    The total was $100,010.

5    *Q.*    And you said you searched the rest of the closet; right?

6    *A.*    Yes, I did.

7            MR. MCGARRY:  Could we look at Government's

8    Exhibit 313.

9        (Exhibit published to the jury.)

10   *Q.*    (BY MR. MCGARRY)  What do we see here, Agent Deliberato?

11   *A.*    You're looking at a photograph of three different

12   passports.

13   *Q.*    And, Agent Deliberato, based on your training and

14   experience, is there anything significant about finding these

15   items in the master bedroom closet?

16   *A.*    Yes.  Based on my training and experience, finding

17   passports in somebody else's possession, it shows control of

18   movement.  Having access to somebody's passport means you can

19   decide when they can and cannot go somewhere.

20           MR. MCGARRY:  Can we look at Government's

21   Exhibit 322, please.

22       (Exhibit published to the jury.)

23   *Q.*    (BY MR. MCGARRY)  What do we see here?

24   *A.*    You're looking at a black truck that was parked outside of

25   the residence.

BRIAN DELIBERATO - Direct by Mr. McGarry

1    Q.   So this truck was parked on the grow property at the time
2    of the search?
3    A.   Yes.
4    Q.   Are you familiar with the -- of whether that truck was
5    searched during the execution of this search warrant?
6    A.   Yes, the truck was searched.
7             MR. MCGARRY:  And can we look at Government's
8    Exhibit 323, please?  Could we zoom in a little bit on those?
9         (Exhibit published to the jury.)
10   Q.   (BY MR. MCGARRY)  What did you find -- what was found
11   inside the truck?
12   A.   Found inside the truck was various bank cards or credit
13   cards, along with a firearm owner identification card and
14   various business cards.
15   Q.   Is this exhibit, is what we're looking at the items that
16   were found inside that truck?
17   A.   Yes.
18            MR. MCGARRY:  If we could look at Government's
19   Exhibit 324, please.
20        (Exhibit published to the jury.)
21   Q.   (BY MR. MCGARRY)  What are we looking at here?
22   A.   You're looking at some of those bank cards that were found
23   inside the truck.
24   Q.   That top bank card, whose name is shown there?
25   A.   Jeff Weng.

BRIAN DELIBERATO - Direct by Mr. McGarry

1          MR. MCGARRY:  If we could look at Government's
2    Exhibit 325.
3        (Exhibit published to the jury.)
4    Q.  (BY MR. MCGARRY)  What do we see here?
5    A.  You're looking at more photographs from the search of the
6    truck.
7    Q.  And on the left, what type of bags were those?
8    A.  Those --
9    Q.  On the right.  I'm sorry.
10   A.  Those are bank bags.
11   Q.  Okay.  And Government's Exhibit 326.
12          MR. MCGARRY:  Could we look at Government's
13   Exhibit 326, please?
14       (Exhibit published to the jury.)
15   Q.  (BY MR. MCGARRY)  What do we see here?
16   A.  You're looking at a close-up of those bank bags containing
17   what appears to be letters.
18   Q.  And were these found in that truck?
19   A.  Yes.
20   Q.  And you mentioned, as part of the search, the marijuana
21   grow rooms are searched; right?
22   A.  Yes.
23   Q.  And you went in those?
24   A.  Yes.
25   Q.  Can we take a look at Government's Exhibit 327, please?

BRIAN DELIBERATO - Direct by Mr. McGarry

1    What do we see here?

2    A.    These were check sheets that were found outside many of

3    the marijuana grow rooms.

4    Q.    And what did those check sheets appear to indicate?

5    A.    They appeared to indicate supervisor roles over -- or --

6    they appeared to indicate that somebody was counting or taking

7    care of or taking note over the -- the grow rooms.

8              MR. MCGARRY:  Could we zoom in on the middle

9    clipboard, please?

10    Q.    (BY MR. MCGARRY)  On the right-hand side, if you can see

11    that, what is shown on the very far right column?

12    A.    What appears to be initials.

13    Q.    What are those initials?

14    A.    T.L.

15              MR. MCGARRY:  Can we look at Government's

16    Exhibit 328, please?

17        (Exhibit published to the jury.)

18    Q.    (BY MR. MCGARRY)  What do we see here?

19    A.    You're looking at a photograph inside of one of those

20    marijuana grow rooms.

21    Q.    This is one of the rooms that you searched on May 17,

22    2023?

23    A.    Yes.

24    Q.    And what was inside this room?

25    A.    Inside this room was marijuana plants and marijuana.

BRIAN DELIBERATO - Direct by Mr. McGarry

1   Q.   And how did you know those were marijuana plants?

2   A.   Based on my training and experience, the -- the smell, the

3   feel, the way that it was being grown, it was marijuana.

4            MR. MCGARRY:   Let's look at Government's

5   Exhibit 329, please.

6        (Exhibit published to the jury.)

7   Q.   (BY MR. MCGARRY)   What do we see here?

8   A.   You're looking at another photograph of check sheets.

9            MR. MCGARRY:   And if we could zoom in on the left

10  clipboard.

11  Q.   (BY MR. MCGARRY)   What do we see written in the far right

12  column?

13  A.   What appears to be the initials T.L.

14  Q.   And what does this clipboard, what did it signify to you

15  when you saw it?

16  A.   The clipboard signified that somebody had gone around and

17  done checks on the room based on the dates.

18            MR. MCGARRY:   Let's look at Government's

19  Exhibit 330, please.

20       (Exhibit published to the jury.)

21  Q.   (BY MR. MCGARRY)   What do we see here?

22  A.   This is another photograph of a marijuana grow room.

23  Q.   And what was in this room?

24  A.   In this room was marijuana plants and marijuana.

25  Q.   And you made that determination based on your training and

BRIAN DELIBERATO - Direct by Mr. McGarry

1   experience?

2   A.   Yes, I did.

3          MR. MCGARRY:  Can we look at Government's

4   Exhibit 331, please?

5          (Exhibit published to the jury.)

6   Q.   (BY MR. MCGARRY)  What do we see here?

7   A.   You're looking at another check sheet that was outside of

8   one of those grow rooms.

9   Q.   And what's written on that far right column?

10  A.   What appears to be the initials T.L.

11         MR. MCGARRY:  And if we could look at Government's

12  Exhibit 332.

13  Q.   (BY MR. MCGARRY)  What do we see here?

14  A.   You're looking at another photograph of a marijuana grow

15  room.

16  Q.   Is this how it appeared when you went in that grow room on

17  May 17, 2023?

18  A.   Yes.

19         MR. MCGARRY:  Could we look at Government's

20  Exhibit 335, please?

21  Q.   (BY MR. MCGARRY)  What do we see here?

22  A.   This is another photograph of a marijuana grow room.

23  Q.   That you went into?

24  A.   Yes.

25  Q.   And did you determine those to be marijuana plants based

BRIAN DELIBERATO - Direct by Mr. McGarry

1   on your training and experience?

2   *A.*   Yes, I did.

3   *Q.*   Now, you mentioned earlier that some video was taken;

4   correct?

5   *A.*   Yes, it was.

6   *Q.*   Could you please take a look at Government's Exhibit 341.

7            MR. MCGARRY:  And I believe that's been admitted by

8   agreement.  If we could, Your Honor, play that video?

9            THE COURT:  You may.

10      (Video played in open court.)

11  *Q.*   (BY MR. MCGARRY)  Does this look familiar to you Agent

12  Deliberato?

13  *A.*   Yes.

14  *Q.*   What are we seeing here?

15  *A.*   This was a video that was taken of one of those marijuana

16  grow rooms.

17           MR. MCGARRY:  And if we could look at Government's

18  Exhibit 342 and play that video.

19      (Video played in open court.)

20  *Q.*   (BY MR. MCGARRY)  What do we see here, Agent Deliberato?

21  *A.*   You're looking at another video of one of those marijuana

22  grow rooms.

23  *Q.*   And based on your training and experience, did you

24  conclude that this room had marijuana plants in it?

25  *A.*   Yes.

BRIAN DELIBERATO - Direct by Mr. McGarry

1   Q.   Now, you said you took samples; right?

2   A.   Yes.

3   Q.   From all the grow rooms?

4   A.   Majority.

5   Q.   Was one of those samples submitted for testing?

6   A.   To the best of my knowledge, yes.

7            MR. MCGARRY:  If I could have Government's

8   Exhibit 405 and approach the witness?

9            THE COURT:  I do not believe -- 405's not been

10  admitted; correct?

11           MR. MCGARRY:  That's right, Your Honor.

12           THE COURT:  Yes, you may approach.

13  Q.   (BY MR. MCGARRY)  Agent Deliberato, do you recognize

14  Government's Exhibit 405?

15  A.   Yes.

16  Q.   How do you recognize it?

17  A.   This is one of the samples that was taken in one of those

18  grow rooms.

19  Q.   And how do you know that?

20  A.   I know that based on my -- my name being there, the

21  description of the item as sample number one.

22      So this would have been the first sample that was cut off

23  the plant, placed into a bag, and then it was sealed inside.

24           MR. MCGARRY:  Your Honor, the United States would

25  move to admit Government's Exhibit 405.

BRIAN DELIBERATO - Direct by Mr. McGarry

1                    THE COURT:  Any objection?

2                    MR. HENRY:  No objection.

3                    THE COURT:  Any objection, Mr. Gallon?

4                    MR. GALLON:  Yes, Your Honor.  I would object.

5      (The following bench conference was held outside the hearing

6  of the jury.)

7                    THE COURT:  Mr. Gallon, your objection?

8                    MR. GALLON:  Yes.  I would just object to the

9  admission.  This is a report prepared by some other person, by

10  a criminalist, and I would --

11                    THE COURT:  Hold on, Mr. Gallon.  I'm sorry to

12  interrupt you.  I think you're mistaken.  I don't think -- I

13  think 405 is just the cutting that was put into an envelope

14  that the agent has identified that he's laying the foundation

15  for the exhibit, but I don't think this is the report.  Is that

16  correct, Mr. McGarry?

17                    MR. MCGARRY:  That's right, Your Honor.

18                    THE COURT:  This is just a cutting?

19                    MR. GALLON:  I was mistaken, Your Honor.  I'm

20  sorry.  Withdraw my objection.

21                    THE COURT:  I will come back to you when the report

22  comes up.

23      (The following record was made in open court, in the

24  presence of all parties, counsel, and in the presence and

25  hearing of the jury.)

```
 1                THE COURT:  405 will be admitted without objection.
 2                MR. MCGARRY:  Could I publish that to the jury, or
 3    at least have him hold it up?
 4                THE COURT:  Yes.
 5         (Exhibit published to the jury.)
 6    Q.   (BY MR. MCGARRY)  And, Agent Deliberato, what's in that
 7    bag?
 8    A.   Inside this bag should be a small sample of marijuana.
 9    Q.   And is this how you collected all your samples and put
10    them in bags like that?
11    A.   Yes.
12    Q.   At the marijuana grow?
13    A.   Yes.
14    Q.   In what building or room did you -- did you mark on that?
15    A.   This is item No. 33, and it was found in room No. 18.
16                MR. MCGARRY:  One moment, Your Honor.
17         I would pass the witness, Your Honor.
18                THE COURT:  Mr. Henry, let's actually take our
19    afternoon break.  We'll take our break until 3:15.
20         Ladies and gentlemen of the jury, we'll take our afternoon
21    break.
22         The usual admonition applies.  Please don't discuss the
23    case amongst yourself or with anyone else.  Keep an open mind.
24    You have not heard all of the evidence.
25         It is in that -- in that regard, it is very important that
```

BRIAN DELIBERATO - Direct by Mr. McGarry

1    you maintain an open mind, not have any communications at all

2    about the case, do not discuss it.

3         Please go for your break to the jury assembly room.

4    You'll remain there until we call back up for you.

5         Court will remain in attendance and seated while the jury

6    departs.  And you can leave your notebooks in your chairs.

7         (Jury exited.)

8              THE COURT:  Anything before we take our break,

9    government.

10             MR. MCGARRY:  Not from the government, Your Honor.

11             THE COURT:  Mr. Gallon?

12             MR. GALLON:  Yes, Your Honor.

13        Once again, I would renew my motion to be able to

14   cross-examine the witnesses.  The state has introduced evidence

15   of the sheets, which are required under Oklahoma state law to

16   keep track of.  I would -- they introduced videos and pictures

17   with state tags on them, all of those things that are acquired

18   on a licensed Oklahoma legal grow, Your Honor.  And I believe

19   that has opened the door for us to cross-examine the witnesses,

20   and I would just ask for the Court to rule on that.

21             THE COURT:  And I have.  How is that even remotely

22   relevant whether or not it is legal under state law?  I mean,

23   therein lies the question.  How is it remotely relevant?

24             MR. GALLON:  I mean, it's --

25             THE COURT:  It's a hard one to answer.

BRIAN DELIBERATO - Direct by Mr. McGarry

1           MR. GALLON:  It is, Your Honor.

2           THE COURT:  The objection will be overruled.

3           MR. MCGARRY:  Can I clarify one thing that counsel

4   said just to make it clear?  We did not introduce records for

5   the state records that he's referring to.  Those were the

6   exhibits that we excepted from that, so I just want to make

7   sure in case for future, that we don't reference those.

8           THE COURT:  And I did understand that.  I thought

9   Mr. Gallon was referring to the clipboards that were hanging

10  out there, which --

11          MR. MCGARRY:  Sorry.  I misunderstood.

12          THE COURT:  I understand that, at least the context

13  of the testimony was in terms of dominion and control and

14  numbers of plants and that nature.  I did not take it as

15  relevant, nor do I believe it is relevant to any of the

16  elements of the charged conduct.  But I still think it is not

17  even remotely relevant to whether or not there is a violation

18  of federal law and the objection will be overruled at this

19  time.

20      Anything further?

21          MR. MCGARRY:  Not from the government, Your Honor.

22          THE COURT:  Mr. Gallon, anything further?

23          MR. HENRY:  No, Your Honor.

24          THE COURT:  Mr. Henry, anything further?

25          MR. HENRY:  No, Your Honor.

```
 1                THE COURT:  Court will be in recess.
 2         (Break taken.)
 3         (The following record was made in open court, in the
 4    presence of all parties, counsel, and in the presence and
 5    hearing of the jury.)
 6                THE COURT:  Mr. Henry, cross-examination.
 7                MR. HENRY:  Thank you.  Could you bring up 313,
 8    please?
 9         (Exhibit published to the jury.)
10                        CROSS-EXAMINATION
11    BY MR. HENRY:
12    Q.   Good afternoon.  Was Special Agent Danielle Shutts with
13    you and Special Agent Nick Nyman?  Were they present that day?
14    A.   At the search there?
15    Q.   Yeah.
16    A.   Yes.
17    Q.   Okay.  Do you see 313?
18         I believe you just testified that, in your expertise, the
19    fact that somebody has passports, that that means they're
20    controlling people's movements; correct?
21    A.   Based on my training and experience.
22    Q.   Right.  What experience -- do you have experience in human
23    trafficking?
24    A.   I have --
25    Q.   I mean, you have been an agent for less than a year;
```

Brian Deliberato - Cross by Mr. Henry

1  right?

2  *A.*  Do I have experience investigating human --

3  *Q.*  Yeah, human trafficking.

4  *A.*  I have -- we have talked about it at Quantico, we have

5  talked about it at different lessons and learning.

6  *Q.*  So it's just training then, not experience; correct?

7  *A.*  Yes.

8  *Q.*  Okay.

9         MR. HENRY:  Can you blow that up for me, please?

10  I'm sorry.  Thank you.

11  *Q.*  (BY MR. HENRY)  Can you read the top name or the first

12  passport?

13  *A.*  Jeff Weng.

14  *Q.*  Yeah.  That's Mr. Weng over there, so he's not controlling

15  anybody's movement but his own, right, with his own passport;

16  correct?

17  *A.*  I don't know what he -- can you rephrase the question?

18  *Q.*  Well, you had just testified with lots of confidence

19  that -- when you were asked what's the significance of having

20  passports, that the significance with your training and

21  experience is that they're controlling the -- the -- I guess

22  the allegation there is that they're controlling their workers'

23  movements by keeping their passports; correct?  That's what you

24  just testified to; correct?

25  *A.*  Yes, based on my training and experience.

Brian Deliberato - Cross by Mr. Henry

 1  *Q.*   Well, let's say training because you just said you don't
 2  have any experience yet.
 3  *A.*   Okay.
 4  *Q.*   The first passport is a U.S. passport for Mr. Weng;
 5  correct?
 6  *A.*   That's what it appears to be, yes.
 7  *Q.*   Right.  So that's not any worker or any other person that
 8  he's controlling; correct?
 9  *A.*   That's his own passport.
10  *Q.*   Right.  The second passport is a Peoples Republic of China
11  passport for Mr. Weng.  That's Mr. Weng's picture.
12       So now he's still not controlling anybody's movement;
13  correct?  It's his passport?
14  *A.*   I don't read Chinese, sir.
15  *Q.*   It's his picture.  The passport below is a female;
16  correct?
17  *A.*   That's what appears to be a female, yes.
18  *Q.*   Right.  And you had testified that it appeared that a male
19  and female were living in that room?
20  *A.*   Yes.
21  *Q.*   All right.  So let me ask you this question:  In your
22  training, if someone is possessing their own passport, does
23  that mean they're controlling other people's movements?
24  *A.*   They have -- can you rephrase the question?
25  *Q.*   Right.  It's a lots less complicated than it sounds.

Brian Deliberato - Cross by Mr. Henry

1      If I possess my own passport, does that mean I'm

2  controlling anybody?  Pick a person.  The gentleman with the

3  glasses on, am I controlling his movement if I possess my own

4  passport?

5  A.    No.

6  Q.    So you would now, I guess, rephrase your testimony that

7  the fact that there are three passports there and two of the

8  three are Mr. Weng's, that doesn't show anything other than he

9  had his own passports in what you claim to be his bedroom;

10  correct?

11  A.    Can you ask the question again?

12  Q.    No.  You don't -- what part of that question don't you

13  understand?

14  A.    Can you repeat the question?

15  Q.    Yeah.

16      He has -- two of those are his passports; correct?

17  A.    I know the top one, based on the name on it, is his

18  passport.

19  Q.    You testified, unless I'm mistaken, that the -- you were

20  asked -- just asked by Mr. McGarry, he asked you a question, he

21  said, What does it mean?  What are the significance to you that

22  there are three passports there?  What was your answer to his

23  question?

24  A.    Based on my training and experience, having other people's

25  passports signifies that they control other people's movements.

Brian Deliberato - Cross by Mr. Henry

1  *Q.*  Right.  Those aren't other people's passports, though.

2            THE COURT:  Is there a question there, counsel?

3  *Q.*  (BY MR. HENRY)  Are they?

4  *A.*  I understand that the passport in the top appears to be

5  Jeff Weng's passport.

6  *Q.*  And you don't know who the other two are?

7  *A.*  I do not speak Chinese, sir.

8  *Q.*  Okay.  Well, you're the United States government.  You

9  work for them; correct?  Do you work for the United States

10 government?

11 *A.*  I'm a special agent of the FBI, part of the United States

12 government, yes.

13 *Q.*  Do you not have interpreters and translators?  Do you, the

14 FBI, do you not have interpreters and translators?

15 *A.*  Yes.

16 *Q.*  So nobody came back with a translation for either one of

17 those passports; correct?

18 *A.*  Not to the best of my knowledge.

19 *Q.*  Now, you know that special agent, is its --what's her --

20 Shutts?  Is that her name?

21 *A.*  I believe it's pronounced Shutts.

22 *Q.*  Shutts.  And Special Agent Nyman; correct?  Nick

23 N-y-m-a-n?

24 *A.*  That is a name that I recognize, yes.

25 *Q.*  You just told us he was there; correct?

Brian Deliberato - Cross by Mr. Henry

1  A.  Yes.

2  Q.  And you know that they had interviewed some of the other

3  people present; correct?

4  A.  Yes, there was interviews conducted.

5  Q.  And those were of other people present at that farm at the

6  time; correct?

7  A.  They interviewed people that were at the farm, yes.

8  Q.  Okay.  And you do know that, as a result of those

9  interviews, there have been no charges of human trafficking

10  against anybody; correct?

11  A.  Not to the best of my knowledge.

12  Q.  Now --

13           THE COURT:  Mr. Henry, can I get you to slow down

14  just a little bit --

15           MR. HENRY:  I'm sorry.  I know -- you gave me a

16  break and put me on a --

17           THE COURT:  Sure.  Slow down just a little bit --

18           MR. HENRY:  I will.

19           THE COURT:  -- and if you would, please, be sure

20  that you let his him finish his answer before you start your

21  question.

22           MR. HENRY:  Yes, sir, Your Honor.

23      Now, can you pull up 338, please?

24  Q.  (BY MR. HENRY)  You are familiar with the fact that when

25  marijuana is grown in this state under licenses, that they --

Brian Deliberato - Cross by Mr. Henry

```
 1    that those people can't put that money in --
 2                 MR. MCGARRY:  Objection, Your Honor.
 3                 THE COURT:  Let him finish -- let him finish his
 4    question.
 5    Q.   (BY MR. HENRY)  Right.
 6         That money does not go in the bank; correct?  If it's a
 7    legal marijuana grow, it can't go in the bank?
 8                 THE COURT:  Is there still an objection, Counsel?
 9                 MR. MCGARRY:  Yes, Your Honor.
10                 THE COURT:  On what basis?
11                 MR. MCGARRY:  Can we go to the headsets?
12                 MR. HENRY:  I brought my own with this in mind.
13       (The following bench conference was held outside the hearing
14    of the jury.)
15                 THE COURT:  What's the basis of the objection,
16    counsel?
17                 MR. MCGARRY:  Your Honor, I think he's getting back
18    into the -- the Court's ruling on the motion in limine.
19                 THE COURT:  Well, I don't think he has yet.  That
20    may be where he's going, but I know that the agent testified
21    about kind of the characteristics of the money and what that
22    may signify from the packaging and the location.
23         So I think it is fair game for cross-examination, but I do
24    want to caution counsel, I don't want to go, again, into the
25    subject of the Court's ruling in terms of legality and state
```

Brian Deliberato - Cross by Mr. Henry

 1    licensure and all that.

 2         Does that make sense?

 3              MR. HENRY:  It does.  My only reason is to rebut

 4    the -- what appeared to be a lay expert opinion on what the

 5    cash signified.

 6              THE COURT:  Sure.  I'll allow the question, but

 7    short leash.

 8              MR. HENRY:  I understand.

 9    Q.   (BY MR. HENRY)  So you testified with your training and

10    experience that the significance was the number of fives;

11    correct?  Correct?

12    A.   No.

13    Q.   Well, you just testified, you said -- they asked you, What

14    does that money mean to you?  And you said that the twenties

15    and the fives mean that that money is being kicked back up the

16    chain, I believe is the word that you used:  Correct?

17    A.   Based on my training and experience, I testified on the

18    smaller denominations.

19    Q.   There's two $5 bills; correct?

20    A.   Twenties would be included in smaller denominations.

21    Q.   Okay.  And you do know that -- are you aware of --

22              MR. HENRY:  I would ask for it to be published just

23    to the witness, and not to the jury, Exhibit 116.

24              THE COURT:  116?  Yeah, I don't think it can be

25    published, but, yes, I mean, you can --

Brian Deliberato - Cross by Mr. Henry

1      MR. HENRY:  I'm not asking it to be published to
2  the jury.
3      THE COURT:  Sure.
4  Q.  (BY MR. HENRY)  Do you see what's in front of you,
5  Exhibit 116?
6      THE COURT:  Does he have a copy of the book,
7  counsel?
8      MR. HENRY:  I didn't realize.  I apologize.
9  Q.  (BY MR. HENRY)  Is that correct?  Do you see that there?
10 A.  I'm looking at a piece of paper that says invoice --
11     MR. MCGARRY:  Objection, Your Honor.
12     THE COURT:  You can re-ask your question, counsel.
13     Agent, if you would, listen carefully to the question.  I
14 think he's just asking you do you see the exhibit that he's
15 referring to, not what is it.
16     MR. HENRY:  Right.  That was exactly my question.
17 Q.  (BY MR. HENRY)  Do you see that exhibit in front of you?
18 A.  I see the exhibit.
19 Q.  Right.  Now, would that exhibit in front of you show where
20 that money may have come from?
21     MR. MCGARRY:  Objection, Your Honor.  He has no
22 personal knowledge of this item that he's being asked to
23 testify about.
24     THE COURT:  And in which case he can answer no.
25     THE WITNESS:  Can you repeat the question?

Brian Deliberato - Cross by Mr. Henry

1   Q.   (BY MR. HENRY)  You see the exhibit here; correct?

2   A.   I see the exhibit.

3   Q.   The exhibit has a dollar amount on it; correct?

4   A.   Yes.

5   Q.   Right?  That dollar amount for that -- from that piece of

6   paper there, what's the -- can you see the date on that piece

7   of paper?

8   A.   I see a date.

9   Q.   And what is that date?

10  A.   2/9/23.

11  Q.   Okay.  So that's obviously before the search warrant;

12  correct?

13  A.   Yes.

14  Q.   Okay.  And there is a dollar amount on that piece of

15  paper; correct?

16  A.   There is --

17  Q.   And that piece of paper, without saying what it's from,

18  appears to be an invoice?

19          THE COURT:  Counsel, I do think, in light of the

20  objection, we are getting a little far afield.

21      I think the question that you had asked was does that

22  exhibit demonstrate, and I'm going to butcher your question,

23  but does that demonstrate the origin of the money, which I

24  think he can answer it does or it doesn't.

25  Q.   (BY MR. HENRY)  Did you hear His Honor's phrasing of my

Brian Deliberato - Cross by Mr. Henry

1   question?

2   *A.*   I did.

3   *Q.*   What is your answer?

4           MR. MCGARRY:  Objection, Your Honor; speculation.

5           THE COURT:  Overruled.

6           THE WITNESS:  No.

7   *Q.*   (BY MR. HENRY)  No what?  That the dollar amount on that

8   document does not show evidence of where that money may have

9   come from?

10  *A.*   I'm unaware.

11  *Q.*   Unaware of what?

12  *A.*   I can't say that money from this came and went anywhere or

13  that went anywhere.

14  *Q.*   So -- perfect.

15      So your -- your opinion that that -- the money that was

16  recovered is based on just opinions, because you're not really

17  aware of where that money came from in the attic either, are

18  you?

19  *A.*   No, I'm not aware of where that money came from.

20  *Q.*   That's not -- do you know what controlled buy money is?

21  Do you know what controlled buy money is?

22  *A.*   Money that's used to buy illicit items.

23  *Q.*   Illicit or not.  It's just money that is what?  Is --

24  there's a record made of it so that money can be traced;

25  correct?

Brian Deliberato - Cross by Mr. Henry

1  A.   Yes.

2  Q.   And the money that was recovered, as far as you know, was

3  not traced, so you have no idea where that money came from;

4  correct?

5  A.   I'm unaware.

6  Q.   Right.  You're kind of making a guess about where that

7  money came from the same way you are making a guess that those

8  passports might mean that they were controlling movement of

9  people; correct?

10  A.   Based on my training and experience.

11  Q.   But it's still a guess; correct?  And let's remember, it's

12  training.  I don't want to pick a fight with you here, but you

13  have not done any human-trafficking cases; correct?

14  A.   I have been a part of various search warrants and searches

15  of marijuana fields.

16  Q.   So the answer to that is, correct, you haven't done any

17  human-trafficking cases?

18  A.   Correct.

19  Q.   Okay.  And you would agree with me that if somebody

20  controlled their own passports, they're then not controlled --

21  those passports don't signify that they're controlling the

22  movement of other people; correct?

23  A.   Having possession of your own passport means you control

24  your own passport.

25  Q.   Right.  You have a passport, I'm assuming; correct?

BRIAN DELIBERATO - Cross by Mr. Bennett

1    A.    Yes, I do.

2    Q.    The fact that you have possession of that doesn't mean you

3    control my movement; correct?

4              THE COURT:  Counsel, I think we have covered this.

5              MR. HENRY:  Thank you, Your Honor.  No further

6    questions.

7              THE COURT:  Mr. Bennett, cross-examination?

8                        CROSS-EXAMINATION

9    BY MR. BENNETT:

10   Q.    Agent Deliberato?  I want to pronounce it correct.

11   A.    Deliberato.

12   Q.    Deliberato?

13   A.    Yes, sir.

14   Q.    Agent Deliberato, you stated you have been with the FBI

15   for about a year?

16   A.    Yes, sir.

17   Q.    Do you know approximately when you started?

18   A.    September 25th.

19   Q.    Of what year?

20   A.    That would be 2022.

21   Q.    Is that the day you got out of the academy or is that

22   before you went to the academy?

23   A.    It's the day that I joined the FBI.

24   Q.    Did you go to the academy after that date?

25   A.    Yes.

BRIAN DELIBERATO - Cross by Mr. Bennett

1  Q.   Approximately how long is the academy?

2  A.   Five months.

3  Q.   And did you leave immediately after that September 25th,

4  or did it happen sometime later?

5  A.   That was the day that I pulled in to the FBI, drove to the

6  FBI.

7  Q.   So essentially five months from September, that's when you

8  were doing this training you were talking about; correct?

9  A.   I was conducting training during that five months.

10  Q.   Yes.  That's my question, is you were doing training from

11  September to approximately five months later, which would be

12  October, November, December, January, February; correct?

13  A.   Correct.

14  Q.   Okay.  So that would take you to February of 2023 when you

15  actually graduated and started working in the field, I assume?

16  A.   Yes.

17  Q.   Okay.  Approximately when did you participate in the

18  search of this subject property?

19  A.   Is that -- April 17th of 2023.

20  Q.   April 17th of 2023.

21       You talked about your experience in marijuana searches

22  specifically.  I think your phrase was various searches for

23  marijuana earlier.  Agreed?

24  A.   Yes.

25  Q.   How many searches involving marijuana have you done during

BRIAN DELIBERATO - Cross by Mr. Bennett

1   your time with the FBI?

2   *A.*   Approximately four or five.

3   *Q.*   Okay.  On April 17th, how many had you done prior to

4   showing up at the subject property?

5   *A.*   I had two -- two other ones.

6   *Q.*   Two other ones.

7        Okay.  When you were at the academy, how long did you

8   spend on drug identification?

9   *A.*   It was included in our training, and then we gained

10  knowledge from other experienced agents, they gave lectures.

11  *Q.*   Okay.  That's not my question, agent.

12       So my question is how much time during that five months in

13  the academy was spent specifically on drug identification, out

14  of that five months?

15  *A.*   I'm unaware of a specific amount of time.

16  *Q.*   Okay.  I know you don't know a specific amount of time,

17  but let me ask you this, you do remember the academy; correct?

18  *A.*   Yes.

19  *Q.*   Do you remember approximately how many classes you went to

20  on drug identification?

21  *A.*   It was included in probably two or three weeks of it.

22  *Q.*   Okay.  During that two or three weeks of training, how

23  much did you work with actual marijuana?

24  *A.*   We never used actual marijuana.

25  *Q.*   Okay.  So whenever you're talking about your training in

BRIAN DELIBERATO - Cross by Mr. Bennett

1   identifying, were you getting that training off of pictures,

2   video?  I mean, how did that happen?

3   *A.*   Yes, photographs and lecture.

4   *Q.*   Okay.  So before you did those first searches that you

5   were involved in, had you been exposed to an actual marijuana

6   substance through the FBI?

7   *A.*   No.

8   *Q.*   Okay.  You talked earlier about how you identify

9   marijuana, and I believe you specifically mentioned the smell.

10   *A.*   Yes.

11   *Q.*   So whenever you're talking about identifying marijuana,

12   you had never seen marijuana in person; correct?

13   *A.*   I have seen marijuana in person, yes.

14   *Q.*   With your time at the FBI, during your training?

15   *A.*   No, not during my FBI training.

16   *Q.*   Okay.  But during that training, that's what your opinion

17   is based off of; correct?

18       I'm asking if, when you give your opinion that this is

19   marijuana, that's based on your training and experience;

20   correct?

21   *A.*   Yes.

22   *Q.*   Okay.  So when you were training with the FBI with these

23   photos, what smell came through on those photos?

24   *A.*   None.

25   *Q.*   Okay.  During your training, were you trained in any

BRIAN DELIBERATO - Cross by Mr. Bennett

1   substances that appeared to be similar to marijuana?

2   *A.*   No.

3   *Q.*   Did you have any training and experience specifically with

4   differentiating hemp from marijuana?

5   *A.*   No.

6   *Q.*   Okay.  Next thing I want to go to is this barracks and

7   this house.

8        You were involved in that search?

9   *A.*   Yes.

10  *Q.*   Okay.  Let's start with the house.

11       Were you able to determine who lived in that house?

12  *A.*   Based on the items that were found in the house.

13  *Q.*   Okay.  And who were those people that lived in that main

14  house?

15  *A.*   We suspected that Mr. Weng, a female, and another

16  individual lived in that house.

17  *Q.*   Okay.  Do you know who the other individual was?

18  *A.*   I can't recall the name at this time.

19  *Q.*   Okay.  Well, let me ask you a simpler question.  Tong Lin,

20  did he live in that house?

21  *A.*   I believe he did, yes.

22  *Q.*   Okay.  And what's that belief based on?

23  *A.*   I'm remembering a photo or an ID that was there.  I can't

24  be quite sure right now.

25  *Q.*   Okay.  That ID, did you take a picture of it?

BRIAN DELIBERATO - Cross by Mr. Bennett

1   A.   I don't know.

2   Q.   Okay.  Did you find Mr. Lin's passport in that main house?

3   A.   Not that I can recall.

4   Q.   Okay.  Did you find any clothing or other items that could

5   be associated with Mr. Lin?

6   A.   Not that I can recall.

7   Q.   Okay.  You talked about that currency that you found.

8        Did you find any currency that you could associate with

9   Mr. Lin?

10  A.   Not that I can recall.

11  Q.   Okay.  Agent, forgive me for kind of going back on this.

12  You mentioned you have a belief that Mr. Lin lived there, but I

13  didn't hear you recalling much evidence that he lived there.

14  Is that a fair assessment?

15  A.   There was another bedroom that I wasn't primarily assigned

16  as the searcher to, and there was items found in that room.

17  Q.   Okay.  What items were found in that room, to your

18  knowledge?

19  A.   I wasn't the primary searcher in that room.

20  Q.   So again, that would not be evidence for your belief.

21  Would you agree with that?

22  A.   I can't recall at this time.

23  Q.   Okay.  So what I'm asking is what specific evidence that

24  you do recall would tie Mr. Lin to that house?

25  A.   I can't recall any at this time.

1    Q.   All right.  You talked about some checklists that were

2    found in these grow houses; correct?

3    A.   Yes.

4    Q.   Okay.  What were those checklists for?  What were the --

5    do you know what they were checking?

6    A.   Based on the location of the checklists outside the grow

7    rooms, the initials, I would assess that they were involved in

8    the growing of the marijuana.

9    Q.   Okay.  I understand that.  Did you review those checklists

10   when you took photos?

11   A.   Yes, I did see the checklists.

12   Q.   Okay.  Did you read what was on them?

13   A.   Some of it, yes.

14   Q.   Okay.  Do you remember what they were titled as?

15   A.   I don't recall.

16   Q.   And if you need to, please look at the book.

17           THE COURT:  Can you direct him to an exhibit

18   number, counsel?

19           MR. BENNETT:  Apologize, Your Honor.

20           THE COURT:  That's okay.

21   Q.   (BY MR. BENNETT)  If you flip to 327, that would be the

22   first one.

23   A.   Okay.

24   Q.   And there's another one that looks like on 329.

25           Okay.  Can you determine what they are checking, based

BRIAN DELIBERATO - Cross by Mr. Bennett

1   upon your review of that exhibit?

2   A.   Right now, looking at Exhibit 329, and the top of it says

3   "inspection for foreign," I can't see the word.  However, based

4   on 327, I would assess the word would be "materials and filth."

5   Q.   Okay.  So we're doing an inspection for cleanliness.  Is

6   that what that appears to be?

7   A.   I know it's an inspection -- I would assess it would be an

8   inspection for foreign materials and filth.

9   Q.   On your two other cases where you did search warrants

10  involving marijuana, in your training and experience, is it

11  common to find logs like that in illegal marijuana grows for

12  materials and filth?

13  A.   Can you repeat the question?

14  Q.   What I'm asking is, that form that you took a picture of

15  and you noted in your testimony earlier, is that an item you

16  commonly find in illegal marijuana grows, in your training and

17  experience?

18          MR. MCGARRY:  Objection, Your Honor.

19          THE COURT:  Do you want to go --

20          MR. MCGARRY:  Yes, Your Honor.

21     (The following bench conference was held outside the hearing

22  of the jury.)

23          THE COURT:  Objection, counsel?

24          MR. MCGARRY:  Yes, Your Honor.  I believe what he's

25  implying is that there are legal marijuana grows by making this

BRIAN DELIBERATO - Cross by Mr. Bennett

1  comparison and asking him to testify about his experience in

2  other marijuana grows that are irrelevant to this case.

3              THE COURT:  Response?

4              MR. BENNETT:  Your Honor, I would respond that I'm

5  not attempting to show compliance with medical marijuana or

6  that this -- that there's a legal grow.  What I'm asking is the

7  significance of that document.

8      During their testimony they specifically pointed it out to

9  try to link my client to the marijuana grow.  What I'm asking

10  is, is that -- does that have any meaningful significance, and

11  that is limited to the scope of that question.

12             MR. MCGARRY:  Can he not ask it that way?

13             THE COURT:  Well, I am going to sustain the

14  objection and allow you to rephrase your question.

15             MR. BENNETT:  Yes, Your Honor.

16             THE COURT:  Mr. Henry, I know you don't have a dog

17  in this hunt, but --

18             MR. HENRY:  I do not, Your Honor.

19             THE COURT:  Thank you.

20      (The following record was made in open court, in the

21  presence of all parties, counsel, and in the presence and

22  hearing of the jury.)

23             THE COURT:  Objection be sustained.  You can

24  rephrase your question, counsel.

25  Q.   (BY MR. BENNETT)  All right.  Agent, those checklists,

BRIAN DELIBERATO - Cross by Mr. Bennett

1  what's the significance of them?

2  A.   To who?

3  Q.   To this case that you investigated.

4       Is there a significance to that paperwork that shows

5  something nefarious or criminal is afoot?

6  A.   It shows supervisor or management over inspecting that

7  room.

8  Q.   Okay.  Management or what?  I'm sorry.  Could you --

9  A.   It shows inspection.

10 Q.   Okay.  In your training and experience, do you find things

11 like that on -- at marijuana grows?

12            MR. MCGARRY:  Objection; relevance, Your Honor.

13            THE COURT:  I'll permit him to answer the question.

14 Objection overruled.

15            THE WITNESS:  Can you repeat the question?

16 Q.   (BY MR. BENNETT)  I'm asking if, in your training and

17 experience, if you commonly find items like that inspection

18 checklist in marijuana grows?

19 A.   We do see paperwork or checklists or --

20 Q.   Checklists like that?

21 A.   I couldn't say if they were the exact checklists or not.

22 Q.   Have you found checklists, though?

23 A.   Yes, we have found documents.

24 Q.   That's not my question, agent.  I'm not asking you if you

25 found other documents or anything else.

1        I'm asking specifically, on the two other searches you

2    have been on, whether you have found checklists similar to that

3    or substantially similar to that?

4    A.   They have had documentation outside the room.  I couldn't

5    say if they looked like this or not.

6    Q.   You don't recall?

7    A.   I don't recall the exact layout of the paperwork outside

8    of those rooms.

9    Q.   Understood.

10       Last thing, I hate to go back, but I forgot to ask you

11   about this.  The barrack searches, you were a part of that;

12   correct?

13   A.   Yes.

14   Q.   Okay.  Did you find anything that belonged to Tong Lin in

15   those barracks?

16   A.   Not to the best of my recollection.

17   Q.   Okay.  So no passports there either?

18   A.   Not that I recall.

19   Q.   Any money in bags that you could attribute to Tong Lin?

20   A.   Not that I recall.

21            MR. BENNETT:  Nothing further, Your Honor.

22            THE COURT:  Redirect?

23                       REDIRECT EXAMINATION

24   BY MR. MCGARRY:

25   Q.   Agent Deliberato, to clarify, the search occurred on

BRIAN DELIBERATO - Redirect by Mr. McGarry

1    May 17th of 2023; correct?

2    A.    Yes.

3    Q.    And you have only been an FBI agent for a little over one

4    year; right?

5    A.    That's correct.

6    Q.    And your training, would you describe it as extensive?

7    A.    Yes.

8    Q.    And were your -- was it full days of training?

9    A.    Yes, it was full days, in excess.

10   Q.    Were you trained by seasoned FBI agents?

11   A.    Yes.

12   Q.    Experienced FBI agents; right?

13   A.    Yes.

14   Q.    And I believe you said that you participated in four or

15   five searches of marijuana grows; right?

16   A.    Yes.

17   Q.    Were those grows large?

18   A.    They were the same size or extremely larger than this one,

19   yes.

20   Q.    And how long would it take to go -- to conduct a search?

21   A.    The entire day.

22   Q.    And so during those searches did you become familiar with

23   the smell of marijuana, marijuana plants?

24   A.    Yes, I did.

25   Q.    And what they look like?

BRIAN DELIBERATO - Redirect by Mr. McGarry

1   A.   Yes.

2   Q.   And did you have any prior personal experience to being

3   exposed to marijuana that helped you in identifying it?

4   A.   Yes.

5   Q.   Tell us about that.

6   A.   I have been around marijuana in the past.  I know what it

7   smells like.

8   Q.   Would you say that marijuana is something that's pretty

9   easy to identify?

10  A.   Yes, it is.

11  Q.   And those photos of the checklists we just went over, were

12  you not able to tell what some of them were just because they

13  were in a foreign language?

14  A.   That's correct, yes.

15          MR. MCGARRY:  One second, Your Honor.

16      Nothing further, Your Honor.

17          THE COURT:  Mr. Henry, anything additional?

18          MR. HENRY:  No.  Thank you, Your Honor.

19          THE COURT:  Mr. Bennett, anything additional?

20          MR. BENNETT:  No, Your Honor.

21          THE COURT:  Any reason why this witness may not be

22  excused?

23          MR. MCGARRY:  No, Your Honor.

24          MR. HENRY:  No, Your Honor.

25          MR. BENNETT:  No, Your Honor.